UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

WILLIAM C. ROMA              :
                            :
v.                          :    CIV. NO. 3:07CV1057(WWE)
                            :
MICHAEL J. ASTRUE,          :
COMMISSIONER OF SOCIAL      :
SECURITY                    :

RECOMMENDED RULING ON PENDING MOTIONS

**I.    INTRODUCTION**

William C. Roma brings this action under Section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security denying plaintiff Social Security Disability Insurance ("SSDI") benefits.

Plaintiff claims that there is not substantial evidence in the record to support the Administrative Law Judge's ("ALJ") determination that plaintiff was not disabled within the meaning of the Act at any time relevant to the ALJ's decision, specifically prior to December 31, 2003.

For the reasons discussed below, plaintiff's Motion to Reverse the Decision of the Commissioner or, in the alternative, Remand for a New Hearing [Doc. # 12] is **DENIED** and defendant's Motion to Affirm the Decision of the Commissioner [Doc. # 19] is **GRANTED**.

1

## II.  ADMINISTRATIVE PROCEEDINGS

Mr. Roma applied for disability benefits on September 2, 2003,[1] alleging disability as of February 5, 1998. (Tr. 37-40).[2] In a notice dated October 23, 2003, Mr. Roma's claim was denied and, on reconsideration, denied again. (Tr. 41-44).

On August 11, 2004, plaintiff filed a timely request for a hearing.  (Tr. 46).  A hearing was held before ALJ Ronald J. Thomas on June 17, 2005.  (Tr. 312-343).  Mr. Roma, who was represented by counsel, appeared and testified.  Id.  On October 26, 2005, ALJ Thomas found that plaintiff had failed to establish that he was disabled within the meaning of the Act on or before December 31, 2003, the date plaintiff last met the special earnings requirement for disability benefits under Title II of the Act.  (Tr. 16-31).  On May 15, 2007, the Appeals Council denied plaintiff's request for review, rendering the ALJ's decision the "final decision of the Commissioner." (Tr. 5-7). Plaintiff, represented by counsel, then appealed to this Court.

---

[1] Although September 2, 2003, is the date plaintiff's application was actually filed (see Tr. 65,76), the application was assigned a protective filing date of August 18, 2003.  (See Tr. 68).  Accordingly, any post-entitlement determinations involving the application filing date would use the protective filing date of August 18, 2003.

[2] As indicated in the decision by the ALJ, claimant also filed an application for supplemental security income ("SSI") payments in March 2005. (see Tr. 19-20, note 2). The SSI application, however, was denied based upon financial criteria due to his large tort settlement (Tr. 68), and no SSI medical review was performed.  Plaintiff did not challenge that action before the ALJ and the issue is not before the Court.

## III. STANDARD OF REVIEW

The scope of review of a social security disability determination involves two levels of inquiry.  The court must first decide whether the Commissioner applied the correct legal principles in making the determination.  Next, the court must decide whether the determination is supported by substantial evidence.  Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971); Yancey v. Apfel, 145 F.3d 106, 110 (2d Cir. 1998).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  Gonzales v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998); Rodrigues v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977).  The court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993).  The court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  In reviewing an ALJ's decision, the court considers the entire administrative record, including new evidence submitted to the Appeals Council following the ALJ's decision.  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  The court's responsibility is to ensure that a claim has been fairly evaluated.  Grey v. Heckler,

721 F.2d 41, 46 (2d Cir. 1983).

Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold the ALJ's decision "creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1987). To enable a reviewing court to decide whether the determination is supported by substantial evidence, the ALJ must set forth the crucial factors in any determination with sufficient specificity. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). Thus, although the ALJ is free to accept or reject the testimony of any witness, a finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible review of the record. Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988). Moreover, when a finding is potentially dispositive on the issue of disability, there must be enough discussion to enable a reviewing court to determine whether substantial evidence exists to support that finding. Peoples v. Shalala, 1994 WL 621922, at *4 (N.D. Ill. 1994); see generally Ferraris, 728 F.2d at 587.

## IV. ELIGIBILITY FOR BENEFITS

Under the Social Security Act, every individual who is under

a disability is entitled to disability insurance benefits.  42
U.S.C. § 423(a)(1).  The Act defines "Disability" as an
"inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not
less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).
The Social Security Administration has promulgated regulations
prescribing a five-step analysis for evaluating disability
claims.  In essence, the Commissioner must find a claimant
disabled if he or she determines "(1) that the claimant is not
working; (2) that he has a "severe impairment;" (3) that the
impairment is not one [listed in Appendix 1 of the regulations]
that conclusively requires a determination of disability; (4)
that the claimant is not capable of continuing in her prior type
of work, and (5) there is not another type of work the claimant
can do."  Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002);
see also Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); 20
C.F.R. §§ 404.1520(b-f), 416.920(b-f).

The burden of proving initial entitlement to disability
benefits is on the claimant.  Aubeuf v. Schweiker, 649 F.2d 107,
111 (2d Cir. 1981).  The claimant satisfies this burden by
showing that the impairment prevents his return to prior
employment.  Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir.

1983).  The burden then shifts to the Commissioner who must show that the claimant is capable of performing another in the national economy job that exists in substantial numbers.  20 C.F.R. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

## V. FACTUAL BACKGROUND

Plaintiff was born on September 24, 1962.  (Tr. 65).  He is a college graduate with a Bachelor of Science degree in business administration from Eastern Connecticut State University.  (Tr. 21, 83, 140, 317-318, 322).  Mr. Roma has a real estate license and his vocational history consists primarily of his work experience as a real estate appraiser.  (Tr. 21, 78, 110, 138, 140, 318, 322).

Plaintiff claims disability due to a combination of "emotional, physical, and mental disabilities." (Tr. 20). His impairments resulted from an automobile accident which occurred on July 3, 1995. (Tr. 147).

## A.   SUBSTANTIAL EVIDENCE

### 1.   Medical Records

Dr. Lawrence Brilliant: Emergency Room Doctor

Following the accident, Mr. Roma was treated by Dr. Lawrence Brilliant at Danbury Hospital.  (Tr. 146-147).  When evaluated in the emergency room, Mr. Roma was alert, awake and oriented.  Id. He complained of tenderness in his left clavicular region and in his right heel.  Id.  Plaintiff was evaluated with x-rays of the spine, chest, abdomen, pelvis, spine and ankle and CAT scans of the head, chest, abdomen, and pelvis, all of which were negative except for small bruising in the area of the small bowel on the left side of the abdomen.  Id.  He complained of neck pain and pain while moving his arms.  Id.  Dr. Brilliant described Mr. Roma's injuries as an acute cervical strain and an acute chest wall contusion.  Id.  Dr. Brilliant noted that "patient was slightly anxious, but really [in] no distress."  Id.  Dr. Brilliant could not identify any other organ injury and noted that Mr. Roma had full sensation throughout his body.  Id.  Dr. Brilliant wrote that there were no known past medical illnesses and Mr. Roma was admitted to the hospital for observational purposes.  Id.

Dr. Stuart Roberts: Radiologist

Dr. Stuart Roberts, a radiologist, found an old healed fracture with minimal deformity of the mid-left clavicle but

otherwise noted that Mr. Roma had a normal supine portable chest. (Tr. 149). Dr. Roberts also noted normal portable cross-table lateral view of the cervical spine, lower lumbar spine, abdomen and upper pelvis. (Tr. 151). Mr. Roma's ankle exam was also normal. (Tr. 152). Upon examination of plaintiff's head scan, Dr. Roberts found normal tomography of the brain. (Tr. 153). Dr. Roberts reported a normal CT scan of the thorax. (Tr. 157).

Dr, Patricia Mitchell: Neuropsychological Evaluation

Three years later, on October 2 and November 2, 1998, Dr. Patricia Mitchell, a neuro-psychologist of Datahr Rehabilitation Institute, examined Mr. Roma's cognitive functioning in order to facilitate treatment and vocational planning. (Tr. 158). Dr. Mitchell found that Mr. Roma reported ongoing problems with concentration and memory. Id.

During her behavioral observations, Dr. Mitchell observed that Mr. Roma arrived promptly and unaccompanied for each of his two three-hour assessment sessions. (Tr. 159). She also noted that he moved somewhat "slowly and stiffly" but was "neatly dressed and adequately groomed." Id. Mr. Roma self-reported a sad and irritable mood. Id. Mr. Roma's "speech was goal directed but not always smoothly fluent." Id.

Dr. Mitchell tested Mr. Roma on the Wechsler Adult Intelligence Scale III and found that his overall cognitive functioning was in the average range. Id. Mr. Roma's verbal-

comprehension abilities were significantly stronger than his more average range perceptual-organizational abilities.  Id.  His academically and environmentally related fund of general information and word knowledge was in the 75th percentile compared to age peers.  Id.  Mr. Roma's arithmetic achievement was in the borderline deficient range, compared to age peers.  Id.  Dr. Mitchell found that errors due to inattention (e.g. using incorrect arithmetic operations) depressed his score into this range.  Id.  Verbal responses to questions requiring knowledge of social judgment were in the average range but verbal abstract concept formation was in the high average range.  Id.  Verbal expression appeared generally within normal limits.  Id.  Comprehension, as measured by Mr. Roma's ability to understand assessment task instructions of varying complexity, also appeared within normal limits.  Id.

Dr. Mitchell found that Mr. Roma's sustained attention to visual information over a 10-minute period was somewhat below expectations.  His divided attention requiring the ability to retain information in working memory while directing attention briefly elsewhere was mildly to moderately impaired.  Id.

Mr. Roma's ability to plan, organize, and execute goal-directed behavior was below expectations due to distractability.  Id.  Dr. Mitchell's observations evinced some cognitive inflexibility that appeared to interfere with Mr. Roma's

9

performance on moderately complex problem-solving tasks.  Id.

Mr. Roma completed a self-report measure of psychological symptomatology and emotional distress which produced a symptom profile of a pattern and magnitude to be considered in the clinical range.  Id.  Dr. Mitchell found that Mr. Roma endorsed a large number of clinical symptoms and reported that the intensity of his current emotional distress was extremely high.  Id.  Mr. Roma reported that he tried to return to work but experienced significant difficulty.  Id.

Dr. Richard Schuster:[3] Tort Claim Psychologist

In March 2002, Richard Schuster, psychologist, interviewed the claimant for more than six hours to prepare a report for Mr. Roma's tort counsel.  (Tr. 23, 162).  In his report, Dr. Schuster observed that "literally throughout the day long assessment, [Mr. Roma] never smiled, was often confused and questions typically needed to be reiterated." (Tr. 197).  Dr. Schuster also observed that Mr. Roma often looked to his wife for assistance in conversation, spoke in a soft voice and was periodically tearful. Id.  Dr. Schuster's impression was that Mr. Roma was "an individual plagued by cognitive, psychiatric, and pain symptoms." (Tr. 198).

Dr. Schuster wrote that because Mr. Roma's situation was chronic and because he had undergone neuropsychological testing

---

[3]  The Court includes Dr. Schuster's report here because it is in the record. Dr. Schuster's evaluation was conducted for only the purposes of Mr. Roma's tort claim and is not raised by plaintiff for purposes of assessing DIB.

in the past, additional assignments were necessarily administered to update his cognitive status.  _Id_.  He found that the results were congruent; Mr. Roma's language skills were significantly better developed than non-language functioning.  _Id_.  Mr. Roma's score was weak on a timed assignment involving non-verbal reasoning ability and tasks requiring sequencing were particularly poor.  _Id_.  Rote processing speed centered around the low-average to average range, and verbal memory was within the average range.  _Id_.  Dr. Schuster found that more complex assignments demanding a processing speed component were below average.  _Id_.  Mr. Roma fell within the average range on tasks which assessed his ability to store information and efficiently retrieve data.  _Id_.

Mr. Roma's wife reported to Dr. Schuster that Mr. Roma "is extremely irritable, serious and quite withdrawn."  (Tr. 199-200).  She further stated that "[h]e displays significant memory problems" and "has extreme difficulty organizing even routine activities."  _Id_.

Dr. Schuster concluded that "if [Mr. Roma] had not been injured, he would have continued to work as a real estate appraiser, moving up that career ladder . . . His prognosis is extremely poor and the most probable outcome is that Mr. Roma will not be able to return to work."  (Tr. 202).

Dr. Schuster performed a labor market analysis using the

11

Labor Market Access Plus.  (Tr. 203).  Two profiles were developed, one within the general labor force and the other a transferability analysis to real estate appraiser; no job matches were found under either profile.  Id.  Dr. Schuster recommended ongoing psychiatric and psychological care with periodic referrals to other specialists as necessary.  (Tr. 204).

        Dr. Mark Ligoriski: Treating Psychiatrist

        From January 26, 1997 until August 27, 2003, Dr. Mark Ligorski treated Mr. Roma once every two months.  (Tr. 222).  On September 15, 2003, Dr. Ligorski performed an analysis for the State of Connecticut Disability Determination Services.  Id.  Dr. Ligorski diagnosed Mr. Roma with major depression and a traumatic brain injury.  Id.  Mr. Roma was being treated with Zyprexa, Klonopin and Wellbutrin.  Id.  Dr. Ligorski described Mr. Roma as having "good hygiene but [with] a slightly shabby or disheveled quality to him."  (Tr. 223).  Since treatment began, Dr. Ligorski noticed that Mr. Roma's "emotional condition had stabilized but at a fairly low and fragile level."  (Tr. 222).

        Dr. Ligorski found that Mr. Roma's short and intermediate memories were impaired.  (Tr. 223).  Mr. Roma concentrated during the twenty-minute therapy sessions but poorly outside of them. Id.  Dr. Ligorski observed that the Mr. Roma's speech was "clear, coherent and non-pressured."  Id.  Mr. Roma had no psychotic symptoms and his judgment and insight was good.  Id.  Dr.

Ligorski stated that "prior to his motor vehicle accident in 1995 Mr. Roma had no psychiatric history but with the development of his chronic pain syndrome and cognitive problems he became severely depressed and anxious."  Id.

Dr. Keven Murphy: DDS Psychiatrist

Plaintiff met with Dr. Keven Murphy on October 1, 2003 for a State of Connecticut Disability Determination Service Psychiatric Review Technique.  (Tr. 225-243).

Dr. Murphy found that Mr. Roma's intellectual functioning was within the average range.  (Tr. 241).  His primary cognitive difficulty appeared to be "diminished concentration and distractibilty."  Id.  Dr. Murphy further found that Mr. Roma could not reliably perform multi-step tasks, but that he retained the ability to carry-out one to two step instructions.[4]  Id.  Dr. Murphy describes Mr. Roma as "socially isolative and probably not suited for public contact work," but he "would be able to interact appropriately with other persons in a work setting."  Id.  Dr. Murphy observed that Mr. Roma was able to drive independently and would be alert to the routine hazards of a workplace.  Id.  He was also capable of making independent decisions in his own interest but relied on his wife to take care of some complex tasks such as bill payment.  Id.

---

[4]  Dr. Murphy's report refers to the vocational rehabilitation specialist finding that plaintiff's combined mental and physical impairments compromised his ability to complete a normal workday.

Dr. Timothy Schumacher: DDS Physician

On March 24, 2004, Dr. Timothy Schumacher conducted a psychiatric evaluation of Mr. Roma and found a mild restriction of daily living activities.  (Tr. 295).  Dr. Schumacher found that Mr. Roma had moderate  difficulty in maintaining social functioning, concentration, persistence, or pace.  Dr. Schumacher did not find any episodes of decompensation.  Id.

Dr. Katherine Tracy: DDS Physician

On November 21, 2004, Dr. Katherine Tracy conducted a Physical Residual Functional Capacity Assessment.  Dr. Tracy determined that Mr. Roma could occasionally lift and/or carry 20 pounds.  (Tr. 245).  Mr. Roma could stand and/or walk, with normal breaks, for a total of about 6 hours in an 8-hour workday. Id.  In addition, Mr. Roma could push and/or pull unlimited amounts.  Id.  Mr. Roma's balance, stopping, kneeling, crouching and crawling, were occasionally limited.  His ability to climb was severely limited.  (Tr. 246).  His manipulative limitations in handing, fingering and reaching in all directions and feeling was unlimited.  Mr. Roma's ability to reach overhead was limited. (Tr. 247).  Depth perception was his only visual limitation.  Id. Mr. Roma had no communicative limitations.  (Tr. 248).

Dr. Mitchell Prywes: Treating Physician

Mr. Roma was a patient of Dr. Mitchell Prywes for a decade. (Tr. 257).  Dr. Prywes diagnosed plaintiff with traumatic brain

14

injury, chronic neck and back pain from the multilevel
degenerative disk disease with cervical radiculopathy, bilateral
carpal tunnel syndrome and chronic depression.  Id.  Dr. Prywes
treated Mr. Roma by applying acupuncture in 25-30 minute sessions
in 2003 and 2004.  (Tr. 258-273).  He also prescribed home
exercises, swimming exercise, Mobic, Lidoderm, Darovet and
Zanaflex.  Id.

On March 4, 2004, Dr. Prywes wrote to Sheila Chunis,
Vocational Disability Examiner, that, "due to chronic pain,
restrictive mobility and cognitive and emotional disabilities,
[Mr. Roma] is unable to tolerate any sustained activity which
would allow him to undertake any type of gainful employment."
(Tr. 257).

Dr. Sekhar Chirunomula: Consultive Examination

On May 21, 2004, Dr. Sekhar Chirunomula performed a
disability determination of plaintiff.  Dr. Chirunomula
observed that Mr. Roma had a flat affect and was a very poor
historian with the exception of dates of prior accidents.  (Tr.
300).  Although he was very slow in responding to questions, he
always came up with appropriate answers.  Id.  Plaintiff
complained of multiple aches and pains in his the neck, shoulder
and wrists and indicated that he has trouble maintaining his
balance and depends on his wife to get ready in the morning.  Id.
Mr. Roma stated that he sleeps in a recliner and can walk from

his home to a park which is about a half-mile away.  Id.
Plaintiff stated that he drives himself locally to doctor's
appointments, the drug store and the supermarket.  Id.  He
complained of being depressed and having problems with attention
span, focus and memory.  Id.

Mr. Roma did not suffer from chest pain, shortness of
breath, gastrointestinal or genitourinary problems.  (Tr. 301).
Mr. Roma was well-developed, well-nourished, well-kempt,
approximately 5 feet 8 inches tall and weighing 161 pounds.  Id.
Mr. Roma's skin, ears, nose, throat and eye exam were
"unremarkable" except that he wore prescription glasses. Id.  Dr.
Chirunomula noted that plaintiff had enlarged thyroids and that
his neck was supple with a full range of motion but that he was
rather cautious and moving very slowly.  Id.  The range of motion
of both shoulders was normal but Mr. Roma expressed a great deal
of effort in hyper-abduction, rotation, flexion, and extension.
Id.  The range of motion of his lumbar spine revealed a 90-degree
flexion with 10-degree extension and normal lateral bend
rotation.  Id.  Mr. Roma could stand and walk briefly on the toes
and heels.  Id.  Plaintiff's range of motion of both hips, knees
and ankles was normal.  He had normal grip strength, gait,
ability to perform fine and gross activities.  Id.  Mr. Roma
showed no signs of atrophy and in fact had well preserved muscle
tone.  Id.  He presented normal orientation and clear speech.

16

Id.  Mr. Roma's memory function revealed the ability to recall
only one of three objects, however, his serial 7's were normal
with a slow response.  Id.  Mr. Roma was "able to recall [his]
Social Security Number without hesitation."  Id.  Dr. Chirunomula
was "unable to extract any significant dysfunction."

Dr. Arthur Waldman: DDS Physician

On June 1, 2004, Dr. Arthur Waldman conducted a Physical
Residual Functional Capacity Assessment.  Mr. Roma could
occasionally lift and/or carry 20 pounds.  (Tr. 303).  Mr. Roma
could stand and/or walk, with normal breaks, for a total of about
6 hours in an 8-hour workday.  Id.  Also, Mr. Roma could sit,
with normal breaks, for a total of about 6 hours in an 8-hour
workday.  Id.  Mr. Roma could push and/or pull unlimited amounts.
Id.  Mr. Roma was occasionally limited in climbing, balancing,
stopping, kneeling, crouching and crawling.  (Tr. 246).  He was
not limited in any manipulative limitations but his overhead
reach was limited.  (Tr. 305).  Mr. Roma did not have any visual
or communicative limitations.  (Tr. 305-306).  Dr. Walden noted
that concentrated exposure to hazards should be avoided because
of cognitive problems.  (Tr. 306).

Edward Moreau: Vocational Expert

On October 21, 2003, Edward Moreau, vocational expert,
performed a vocational analysis on plaintiff and found the
plaintiff not disabled.  (Tr. 110.)  Mr. Moreau found that

plaintiff's RFC revealed that he could perform work at the light level of exertion. Id. He was able to complete simple tasks and maintain a regular schedule. Id. Mr. Moreau found that Mr. Roma might have difficulty interacting with the public and that he was unable to return to past relevant work. Id. As a younger worker with a college education, however, it was expected that he would be able to make an adjustment to other work, such as charge account clerk, order clerk, or addresser. Id.

Sheila Chunis: Disability Examiner

On June 3, 2004, Sheila Chunis, disability examiner, found that the "vocational analysis performed on the initial level claim, dated October 21, 2003 was still valid." (Tr. 127).

**2. Plaintiff's Testimony**

At the hearing, plaintiff testified that he was 43 years old, had a college degree, and was married with two children. Mr. Roma stated that prior to his 1995 accident, he was "very healthy, muscular and in good shape" and that he had no emotional problems. (Tr. 321-322). He testified that he stopped working in February 1998 because he had a physical and mental breakdown. (Tr. 318). He stated that he suffered from vision problems, stomach problems, headaches, dizziness, nausea and stiffness. (Tr. 319). Plaintiff testified that the worst of his problems was the combination and inconsistency of the mental and physical ailments, stating that "the weather affects me very badly,

18

changes in barometric pressure." Id.  Plaintiff testified that
if he breathes in too deeply, he can feel his ribs stick into
him.  (Tr. 324).

Mr. Roma testified that he went back to his job part-time
after the accident and did his prior job, even though it was
harder and he made mistakes.  (Tr. 328).  He stated that he was
able to drive for about half an hour in duration.  (Tr. 330).  He
testified that when his children are in school, he is home alone
all day and he does "straighten up the breakfast mess."  (Tr.
331).  Mr. Roma stated that he is not able to do work around the
house like he used to but does indeed do some things, such as the
laundry and grocery shop.  (Tr. 334-335).  Mr. Roma stated that
he is able to go on one or two family vacations a year to Lake
George or Vermont.  (Tr. 336).  Plaintiff testified that he uses
the computer at home; he has two email addresses and checks his
bank account online but that he does not know word processing.
(Tr. 338, 342).

## VI.  PLAINTIFF'S CLAIMS

Plaintiff contends that the ALJ made several crucial errors
in denying his Disability Insurance Benefit ("DIB") claim.
First, plaintiff claims that the ALJ erroneously set aside the
treating physicians' opinions.  Second, plaintiff claims that the
ALJ misapplied Rule 202.21 of the Medical-Vocational Guidelines
and acted as his own medical and vocational expert.

1.  **ALJ's Ruling**

In his ruling, the ALJ followed the SSA's five-step sequential analysis.  First, he found that plaintiff has not engaged in substantial gainful activity since February 1998. (Tr. 30).  Pursuant to step two, he found that "the claimant had severe physical and mental impairments within the meaning of the regulations."  (Tr. 30).  Specifically, the ALJ found that Mr. Roma had sustained strains to his shoulders, chest, neck, one hip and right foot in the July 1995 accident and was later treated for chronic myofascial pain syndrome, headaches, depression, anxiety and DeQuervains Tenosynovitis in 2001.  Mr. Roma also had left carpel tunnel surgery in March 2001 and had Botox treatment for intermittent ocular diplopia.  Id.  *The* ALJ, however, found that through December 31, 2003, the claimant's medically determinable impairments did not meet, nor medically equal, the criteria for one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, (Tr. 30).  Nevertheless, the ALJ analyzed the plaintiff's claim under the fourth step of the analysis and found that the claimant's medical impairments prevented him from returning to the full duties of his past relevant work as a licensed real estate appraiser.  20 C.F.R. § 404.1565.  (Tr. 30). The ALJ found that other work existed in significant numbers in the national economy that accommodated plaintiff's residual functional capacity and vocational factors, and thus the claimant

was not disabled.  Id.  In considering the totality of the
evidence, the ALJ found that when plaintiff's hospital,
treatment, MRI, CT scan and examination were considered together
with his written claim reports and testimony, his alleged
physical and mental limitations were not fully credible as
restricting him from work less challenging than his past work as
a real estate appraiser.  Id.

In making this assessment, the ALJ stated that:

The chronology from Danbury Hospital records, diagnostic
test results, treatment procedures and therapy for Social
Security (rather than tort or worker's compensation)
purposes is much more varied than counsel's overview.  These
examples show a diverse pattern of moderate initial
injuries; a return to SGA-level work for over two years (six
hours per day); and emotional and marital issues in 1998.
As a whole, several key problems improved or stabilized with
specialized treatment, i.e. his vision and his anxiety.

(Tr. 22-23).

After careful consideration of the entire record, the ALJ
found that Mr. Roma could perform light exertion subject to the
following limits from his injuries and depression: "1) duties are
limited to simple, routine, repetitive work with one or two step
instructions, and coworkers, and in routine interaction with
customers; 2) overhead lifting with his left non-dominant
shoulder is occasional; and 3) only occasionally should he
perform bending stooping twisting, squatting kneeling, crawling,
climbing and balancing.  Within these limits he can work for a
regular work day and work week."  (Tr. 30.)

21

The ALJ then discussed the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and Social Security Ruling ("SSR") 96-4p and 96-7p.  (Tr. 18-20).  The ALJ also considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.  (Id.).

Plaintiff argues that the ALJ gave insufficient weight to the opinions of Dr. Ligorski and Dr. Prywes.  (Pl's Memo at 17.) While it is true that the ALJ will generally adopt the treating physician's opinion when it concerns the nature and severity of an impairment, the opinion of a treating physician will not be afforded controlling weight when it is inconsistent with other substantial evidence of record.  20 C.F.R. § 404.1527(d)(2); See Veino v. Barnhart, 312 F. 3d 578, 588 (2d Cir. 2002).  In determining the weight to give to an opinion, the ALJ must consider various factors, such as the length of the treating relationship and consistency of the opinion with the record as a whole, and he must provide good reasons for the weight given to the opinion.  20 C.F.R. § 404.1527(d)(2).  The ALJ recognized that the treating physician's opinion may receive controlling weight.  Though receiving less weight, the opinions of DDS consultants must be considered as expert opinions.  (Tr. 26). The ALJ reasonably found that Dr. Prywes' opinion was not well

22

supported and was inconsistent with the evidence and provided sufficient reasons for his determination.[5]

Plaintiff's argument as to Dr. Ligorski is misplaced; the ALJ accepted Dr. Ligorski's report that the plaintiff had a history of severe depression and anxiety. (Tr. 26). The ALJ recognized that Dr. Ligorski's reports were entitled to extra weight as that of the treating psychiatrist and found that his reports were in line with the two reports of the two DDS psychologists, Drs. Murphy and Schumacher. Id. Dr. Ligorski's report detailed that Mr. Roma's emotional condition stabilized at a low level and that he had clear and coherent speech and only one reported episode of decompensation in 1998. (Tr. 23). Dr. Ligorski stated that plaintiff's "emotional condition has stabilized but at a fairly low and fragile level." (Tr. 222). In addition, Dr. Ligorski diagnosed that Mr. Roma's "insight and judgment was good, and there were no psychotic symptoms." (Tr. 223). Dr. Ligorski's reports show a positive response to medication and outpatient counseling for anxiety and depression. Id.

Dr. Murphy found that Mr. Roma could carry out one-to-two step tasks. He described Mr. Roma as "socially isolative and

---

[5]   Plaintiff does not raise the weight the ALJ gave to Dr. Schuster's opinions. Dr. Schuster completed an assessment of the plaintiff on April 9, 2002 for the sole purpose of his tort lawsuit and those findings are not binding upon the Commissioner. Tr. 24.

probably not suited for public contact work," but he "would be able to interact appropriately with other persons in a work setting."  Mr. Roma drove himself and was capable of making independent decisions.  Likewise, Dr. Schumacher found only a mild restriction of daily activities and moderate difficulty maintaining social functioning, concentration or persistence. (Tr. 295).  Accordingly, the ALJ found all three doctors findings were aligned for the most part.

To the extent the ALJ discounted Dr. Ligorski's opinions, he showed where it was inconsistent with the other evidence contained in the record.

While the ALJ considered the findings of plaintiff's treating physician, Dr. Prywes, he adopted different conclusions based on the record as a whole.  Plaintiff relies on Dr. Prywes' March 2004 letter which read, "Due to chronic pain, restrictive mobility and cognitive and emotional disabilities, he is unable to tolerate any sustained activity which would allow him to undertake any type of gainful employment."  Ex. 10F, p.2.  All of Dr. Prywes' treatment notes are substantially similar and indicate that an increase in active pain-free range of motion was observed after each treatment.  (Tr. 258-273).

The ALJ evaluated the length of the treating relationship and consistency of the opinion with the record as a whole in assessing the weight to be given to the evidence.  20 C.F.R. §

24

404.1527(d)(2) Here, the record reflects that Dr. Prywes first saw plaintiff in January 1997 and then not again until July 2003. This is especially important because Mr. Roma was receiving DIB until December 31, 2003 and was not treated by Dr. Prywes until the end of his DIB benefit award.

The ALJ compared Dr. Prywes' findings with those of Dr. Chirunomula, who conducted a physical exam of Mr. Roma in May 2004. Dr. Chirunomula was unable to diagnose any significant dysfunction.  Dr. Chirunomula wrote,

> [H]e drives himself locally to his doctor's appointments, to the drug store and the supermarket.  He does not do any heavy work in or around the house.  He has problems with sleep because it hurts to turn.  He also complains of being depressed, sees a psychiatrist and takes medications.  He also admits to problems with attention span, focus and memory.

(Tr. 300).  The ALJ compared a pain chart contained in Dr. Prywes' records that was completed by Mr. Roma in 1997 to Dr. Chirunomula's findings.  The pain chart shows pain primarily in the neck, elbows, wrists, right ankle and feet, whereas Dr. Chirunomula's findings showed a normal range of motion of both shoulders, hips, knees and ankles.  (Tr. 280).  There was no evidence of atrophy and plaintiff's muscle tone was well preserved with a strength rating of 5 out of 5.  Dr. Chirunomula also observed that his ability to perform fine and gross activities was normal, remote memory was intact and his serial 7's were normal but with a slow response.

25

The ALJ also considered Dr. Patricia Mitchell's neuropsychological evaluation and found her comments to be more persuasive that Dr. Prywes' general comments.  (Tr. 26).  On referral from Dr. Prywes, Dr. Mitchell found that Mr. Roma had average scores on the Wechsler Adult Intelligence Scale, with "high average verbal-comprehension abilities."

The ALJ provided sufficient reasons for his determination that Dr. Prywes' opinions were not well supported and were inconsistent with the evidence.  The ALJ's discussion makes it clear that his consideration of Dr. Prywes' opinions, viewed in conjunction with the record as a whole, is an appropriate analysis of the medical record and comports fully with the governing regulations and controlling case law.  (Tr. 20-29).  To the extent that the ALJ discounted Dr. Ligorski's opinions, he reasonably found that they were not well supported and inconsistent with the evidence.

## 2.  <u>ALJ'S Credibility Assessment</u>

The ALJ considered all of the evidence, in the form of objective medical evidence from sources who treated and examined the plaintiff, assessments from both psychologists and psychiatrists, and plaintiff's own testimony.  (Tr. 20-29).

The function of the Commissioner includes evaluating the credibility of all witnesses, including the claimant.  <u>See</u> <u>Carroll v. Secretary of HHS</u>, 705 F.2d 638, 642 (2d Cir. 1983).

The ALJ's findings must be consistent with the other evidence in the case. Id. at 261.

In making a disability determination, all symptoms, including pain, must be considered. 20 C.F.R. § 404.1529 (a). In evaluating subjective symptoms, a claimant's statements are to be considered only to the extent that they are consistent with medical evidence. 20 C.F.R. §§ 404.1529(a), 416.929(a). The claimant's allegations need not be substantiated by medical evidence, simply consistent with it. Youney v. Barnhart, 280 F. Supp. 2d 52, 61 n.4 (W.D.N.Y. 2003).

If the claimant demonstrates the existence of a medically determinable impairment that could reasonably be expected to produce the symptoms, the Commissioner must evaluate the intensity, persistence and functionally limiting effects of the symptoms based on all available evidence. See SSR 96-7p, 1996 WL 374186, at *1-2 (S.S.A. July 2, 1996). This requires the adjudicator to make a finding about the credibility of the individuals's statements abut the symptoms and their functional effects. Id. Statements about the intensity and persistence of pain and symptoms will not be rejected, however, simply because the objective medical evidence does not support the claim. 20 C.F.R. § 404.1529(c)(2). Other factors which will be considered include the claimant's medical history, diagnoses, daily activities, prescribed treatments, efforts to work and any

27

functional limitations or restrictions caused by the symptoms.

See 20 C.F.R. § 404.1529(c)(3).  In addition,

> [W]hen evaluating the credibility of an individual's
> statements, the adjudicator must consider the entire
> case record and give specific reasons for the weight
> given to the individual's statements.
>
> The finding on the credibility of the individual's
> statements cannot be based on an intangible or
> intuitive notion about an individual's credibility.
> The reasons for the credibility finding must be
> grounded in the evidence and articulated in the
> determination or decision.  It is not sufficient to
> make a conclusory statement that "the individual's
> allegations have been considered" or that "the
> allegations are (or are not) credible."  It is also not
> enough for the adjudicator simply to recite the
> factors that are described in the regulations for
> evaluating symptoms.  The determination or decision
> must contain specific reasons for the finding on
> credibility, supported by evidence in the case record,
> and must be sufficiently specific to make clear to the
> individual and to any subsequent reviewers the
> weight the adjudicator gave to the individual's
> statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186, at *4.

The ALJ performed an extensive assessment of plaintiff's

impairments, his medical history and treatment, the reported

clinical findings, observations and medical opinions; he also

expressly evaluated plaintiff's subjective complaints of pain,

alleged functional limitations and other symptoms.  (Tr. 20-29).

Contrary to plaintiff's contention, the trier of fact here did

not ignore or improperly evaluate the opinions of record.

Rather, the evaluation and rationale of the ALJ's decision

provides a very specific and detailed discussion of the medical evidence proffered by plaintiff.  Id.

To the extent that plaintiff alleges that his functional capacity was limited to less than light work, the ALJ reasonably found that such subjective statements were not fully credible. (Tr. 30 at ¶5).  In this regard, the ALJ is not bound by a claimant's subjective complaints and is entitled to make an independent judgment regarding the degree of impairment caused by the claimant's condition.  Aponte v. Secretary of Health and Human Services, 728 F.2d 588, 591-592 (2d Cir. 1984); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).  Indeed, it is well within the discretion of the Commissioner to disbelieve plaintiff's testimony in light of other competent evidence. McBrayer v. Secretary of Health and Human Services, 712 F.2d 795, 799 (2d Cir. 1985).

Here, the ALJ cited to and relied upon the findings and clinical observations reported by plaintiff's treating and examining medical specialists, as well as the opinions of the Commissioner's medical consultants, as support for his determination that plaintiff retained a functional capacity to engage in a wide range of physical activity at a light exertional level.  (Tr. 20-31).  Such a determination is the prime responsibility of the trier of fact, 20 C.F.R. § 404.1527(e), and as such, was properly based upon an assessment of the medical

record in its entirety, as well as the inferences permissibly drawn from the analysis of the evidence.  Making that assessment, the ALJ found that plaintiff's subjective allegations regarding his symptoms and functional limitations were not fully credible. (Tr. 30 at Finding 5).

After careful consideration of the entire record, the ALJ found that the claimant had the residual functional capacity to perform a significant range of light work.  (Tr. 31). In making this assessment, the ALJ stated that he considered "all symptoms, including pain and anxious feelings, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  (Tr. 22). According to the ALJ, "all evidence, not merely diagnostic results, was carefully compared for consistency, supportability and other specified factors."  Id.

Dr. Arthur Waldman conducted a Physical Residual Functional Capacity Assessment and determined that Mr. Roma could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (Tr. 303).  In addition, Dr. Waldman found that Mr. Roma could stand, sit, and/or walk for a total of about 6 hours in an 8-hour workday.  Id.

At his hearing before the ALJ, Mr. Roma testified that he had gone back to work about three months after the accident for approximately two years. (Tr. 320). Plaintiff also testified that

he had a driver's license and he was able to drive for about half an hour. Id. Moreover, Mr. Roma stated that he is home alone all day and that he does straighten up, do the laundry and grocery shopping. (Tr. 331-335). In addition, Mr. Roma also testified that he takes family vacations once or twice a year, and uses a computer to email and access online banking. (Tr. 336, 338, 342).

Additionally, the ALJ noted that Dr. Shuster's report was prepared for Mr. Roma's tort claim[6] and, as such, it is "merely a medical consultant's test report, and not the report of a treating psychologist" for SSA purposes. (Tr. 23).

## 3. Non-Exertional Impairments

Plaintiff claims that the ALJ wrongly acted as his own medical and vocational expert and misused the medical-vocational guidelines because there were severe non-exertional impairments which generally require the testimony of a vocational expert to support a finding of residual functional capacity for substantial gainful activity.

Once a claimant proves he cannot return to his former work, the Secretary must show that there are jobs in the national economy that the claimant can perform. In the ordinary case, the

---

[6] A decision by another governmental or non-governmental agency "about whether you are disabled . . . is based on its rules and is not our decision. 20 C.F.R. § 404.1504. As such, this report was properly discounted by the ALJ. See Tr. 27 ("The ratings made by physicians, consultants, and agencies for the claimant's motor vehicle accident and/or worker's compensation cases do not bind the Commissioner").

Commissioner meets his burden at the fifth step of the disability determination analysis by resorting to the applicable medical vocational guidelines ("the grids"), 20 C.F.R. §404, Subpt. P, App. 2 (1986).  Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999) (quoting Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)).  The grids "take into account the claimant's residual functional capacity in conjunction with the claimant's age, education, and work experience."  Rosa, 168 F.3d at 78 (quoting Zorilla v. Chater, 915 F.Supp. 662, 667 (S.D.N.Y. 1996)).  "Based on these considerations, the grids indicate whether the claimant can engage in any substantial gainful work existing in the national economy."  Rosa, 168 F.3d at 78.  However, if a claimant's non-exertional impairments "significantly limit the range of work permitted by [her] exertional limitations," then the grids obviously will not accurately determine disability status...."  Bapp, 802 F.2d 601, 605.  In Bapp, the Second Circuit held that the necessity of vocational expert testimony must be determined on a "case-by-case basis."  Id.  Thus, in the instant case, the Court must determine whether Roma's non-exertional impairments significantly limit the range of work permitted by his exertional limitations.

In determining that plaintiff was capable of performing "light exertion for a regular work day and work week," the ALJ relied on Rule 202.00 of the grids as well as the opinions of two

vocational adjudicators.  Rule 202.00 essentially requires a
finding of not disabled for individuals who remain capable of
doing light work.  See 20 C.F.R. § 404 Subpt. P, App. 2, Sec.
202.00.  "Light work" requires that a person have the ability to
lift up to twenty pounds and the ability to do a good deal of
walking or standing. "Since frequent lifting or carrying requires
being on one's feet up to two-thirds of a workday, the full range
of light work requires standing or walking, off and on, for a
total of approximately 6 hours of an 8 hour workday." See SSR
83-10, Titles II and XVI: Determining Capability to Do Other
Work-The Medical-Vocational Rules of Appendix 2.

The ALJ found that Mr. Roma had a history of depression and
anxiety which was severe but that it had stabilized at a low
level.  Under Parts B and C of Listing Sections 12.04 and 12.06,
the ALJ found that Mr. Roma did not have functional limitations
of Listing-severity.  (Tr. 26).  The ALJ noted that plaintiff's
activities of daily living were only mildly limited and found no
Part C functional limitations.  Id.

Edward Moreau found that the Mr. Roma could perform work at
the light level of exertion.  (Tr. 110).  Plaintiff's MRFC
indicated he was able to complete simple tasks and maintain a
regular schedule.  Id.  Mr. Moreau concluded that, even though
Mr. Roma is unable to return to past relevant work, he is a
"young worker with a college education who can be expected to

33

make an adjustment to other work, such as: order clerk, or
addresser." Id.  On October 21, 2003, Sheila Chunis affirmed the
findings of Mr. Moreau.  (Tr. 110, 127).

The ALJ found the vocational adjudicators' findings to be
consistent with the medical opinions of Drs. Ligorski, Murphy and
Schumacher.  In addition, the ALJ found that the claimant's age,
college diploma, history of successful work, and successful
interactions in a job setting (only two employers in a long
period) were all favorable factors for a successful vocational
adjustment.  (Tr. 29).

Although plaintiff does not point to other non-exertional
limitations, the RFC assessments by Drs. Tracy and Waldman
indicate that Mr. Roma's ability to climb, balance, stop, kneel,
crouch and crawl was occasionally limited. Climbing, balancing,
stopping, kneeling, crouching and crawling are non-exertional
postural functions which, normally, would preclude exclusive
reliance on the Grid.  See 20 C.F.R. § 404. 1569a(a)-(c)(1)(vi).
Here, however, the ALJ could rely solely on the medical
vocational guidelines or the grids at step five of his analysis
of social security disability benefits claim because there is no
evidence of any non-exertional limitation that so narrowed Mr.
Roma's possible range of work as to deprive him of meaningful
employment opportunity.  The ALJ's decision to discount Dr.
Prywes' March 2004 letter, as inconsistent with other substantial

evidence in record, made plaintiff's case an "ordinary" one, in which reliance on grids was appropriate. 20 C.F.R. §§ 404.1566, 416.966.  See Bapp, 802 F.2d at 605 (noting that, even in presence of nonexertional limitations, "[i]f the [grids] adequately reflect a claimant's condition, then their use to determine disability status is appropriate").

The ALJ evaluated all of the evidence in the record in finding that the plaintiff had a residual functional capacity for substantial gainful activity.

## VII. CONCLUSION

Substantial evidence supports the ALJ's decision to discount Dr. Prywes' March 2004 statement, making Mr. Roma's case an "ordinary" one in which reliance on the grids is appropriate. Rosa v. Callahan, 168 F.3d at 78. Plaintiff's Motion to Reverse the Decision of the Commissioner or, in the alternative, Remand for a New Hearing [Doc. # 12] is **DENIED** and defendant's Motion to Affirm the Decision of the Commissioner [Doc. # 19] is **GRANTED**.

Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of the receipt of this order. Failure to object within fourteen (14) days may preclude appellate review. See 28 U.S.C. § 636 (b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 72.2 of the Local Rules for United States Magistrates; Small v. Secretary of H.H.S., 892 F.2d 15 (2d Cir. 1989) (per curiam); F.D.I.C. v. Hillcrest Associ., 66 F.3d 566, 569 (2d Cir. 1995).

So ORDERED at Bridgeport this 12th day of March 2010.

```
_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE
```